# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 10-2376/3491

_____

| | | |
|---|---|---|
| Ninoska Lopez-Amador, | * | |
| | * | |
| Petitioner, | * | |
| | * | Petition for Review |
| v. | * | of an Order of the Board |
| | * | of Immigration Appeals. |
| Eric H. Holder, Jr., Attorney | * | |
| General of the United States, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: May 10, 2011
Filed: August 15, 2011

_____

Before MELLOY and BENTON, Circuit Judges, and GRITZNER,[1] District Judge.

_____

MELLOY, Circuit Judge.

Ninoska Lopez-Amador petitions for review of a Board of Immigration Appeals ("BIA") decision affirming an Immigration Judge's ("IJ") denial of her applications for asylum, withholding of removal, and deferral of removal under the Convention Against Torture ("CAT"). She also seeks review of the BIA's denial of her petition to reopen her case based on additional evidence. We deny her petitions.

---

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

## I. Background

Ms. Lopez is a native and citizen of Venezuela. She was admitted to the United States as a tourist on July 26, 2002. Her tourist visa expired in January 2003, and she applied for and received a six-month visa extension until July 2003. She next applied for a student visa but was denied student status in March 2003. Although the school to which she applied advised her to return to Venezuela at that time, Ms. Lopez remained in the United States beyond July 2003 without authorization.

The government claims it received Ms. Lopez's application for asylum and withholding of removal on November 20, 2003.[2] On October 22, 2004, Immigration and Customs Enforcement issued a Notice to Appear and charged Ms. Lopez with being removable pursuant to 8 U.S.C. § 1227(a)(1)(B).

Ms. Lopez filed her 2003 application pro se, and she received two continuances to allow her to obtain an attorney. In August 2007, with the assistance of counsel, she submitted a revised application. In the initial 2003 application, which her counsel stated "doesn't make sense as written," Ms. Lopez alleged sexual orientation as the reason she suffered persecution. She also answered that neither she nor any family member was part of any groups or organizations in her home country. In the 2007 application, however, she answered this question in the affirmative, elaborating that she "always supported" the Democratic Action Party (an anti-Hugo Chavez political group) and that her mother and siblings in Venezuela "favor the ideas" of the party. In this 2007 application, she also alleged primarily that her political affiliations were the basis for persecution. In both her 2003 and 2007 applications, Ms. Lopez checked the "No" box when asked if she was afraid of being subjected to torture in Venezuela.

---

[2] Ms. Lopez claims she submitted an application for asylum to the United States government in September 2003. However, the government says it did not receive this earlier application, and Ms. Lopez's sole proof of submission is her testimony.

Ultimately, on October 20, 2008, Ms. Lopez received an evidentiary hearing before an IJ. At the hearing, primarily through her own testimony, Ms. Lopez alleged the following background facts. She holds a master's degree in finance and worked in Caracas as a mid-level executive for a phone company and as a shipment inspector before leaving Venezuela. Through these jobs, she achieved a certain amount of financial success and owns two condominiums in Venezuela. She is unmarried and has no children, but her mother and four siblings remain in Caracas.

According to Ms. Lopez, Venezuela's political and social climate began to change unfavorably in 2001. She alleges personal involvement with the Democratic Action Party since well before that change, beginning in 1995. Her involvement began with helping the needy, but, starting in 2000, she claims she was actively engaged in approximately fifteen demonstrations against the Hugo Chavez regime. The last of these demonstrations occurred on April 11, 2002, and involved thousands of protestors and onlookers throughout Caracas. Ms. Lopez testified that she was caught in the middle of the crowd when soldiers attacked the group with teargas and pellet guns. Snipers shot at those in the street from nearby buildings. Ms. Lopez said people around her were injured and killed and that she subsequently spent five days at home in a state of shock.

In the three months between the April 11 demonstration and Ms. Lopez's departure for the United States, Venezuelan police stopped her vehicle at checkpoints on ten different occasions. She believes she was targeted because officers recognized her car, but she admits other people were also going through checkpoints throughout Caracas and were asked the same questions, including political-affiliation inquiries.

Ms. Lopez continued to work until the end of June 2002. She testified that she left her job in June because government restrictions on business made it difficult for her to obtain clients. She said that she fears economic hardship if returned to Venezuela, noting that the Chavez government has a "one property" policy that would

require her to sell one of her two condominiums at an unfavorable price. Ms. Lopez also fears she will be denied government jobs or services in Venezuela if she does not abandon her political convictions. She was, however, able to renew her passport in September 2001, while Chavez was in power. The Chavez government did not try to prevent her from leaving the country. Additionally, Ms. Lopez was able to keep working in Venezuela until she chose to leave her job in June 2002. Ms. Lopez also conceded that other members of her family had not experienced trouble with the authorities because of their beliefs or affiliations. She reported that even her mother, who worked for a Venezuelan supreme court justice with the previous government, had not been persecuted by the Chavez regime.

Ms. Lopez testified that she was persecuted in Venezuela for being a lesbian and fears being harassed or jailed for her sexual orientation if she returns. She reported an incident in Caracas in which she and her lesbian partner were walking in a park when they were verbally ridiculed by a police officer on account of their "immoral" lifestyle.

Ms. Lopez supported her application with documentary evidence, including a 2007 State Department Human Rights Report. This 2007 report indicates that President Chavez has maintained lists of his political opponents who "were often ineligible to receive government jobs or services." Ms. Lopez testified she did not submit her Democratic Action Party card as evidence because she did not have it.

After hearing the evidence, the IJ issued an oral decision denying Ms. Lopez's applications for relief and ordering her removed to Venezuela. The IJ found the initial application untimely and, in the alternative, denied asylum on the merits. The IJ did not expressly make an adverse credibility ruling, but found Ms. Lopez failed to show she was specifically targeted or physically harmed by the government. The IJ denied withholding of removal for the same substantive reasons and also found that Ms. Lopez did not meet the standard required for relief pursuant to the CAT.

-4-

Ms. Lopez appealed the IJ's decision to the BIA, and the BIA affirmed on the same grounds. She then moved to have her case reopened, providing the BIA with new evidence of allegedly worsening circumstances in Venezuela, including many pages of documents that postdate her final hearing. This new evidence included: (1) a letter from the president of the Organization of Venezuelans in Exile ("ORVEX"), verifying Ms. Lopez's membership in the group since 2009 and asserting that the Venezuelan government has access to a list of asylum seekers in the United States; (2) the State Department's 2008 and 2009 Human Rights Reports for Venezuela; and (3) additional articles regarding current events in Venezuela, including an *El Nuevo Herald* article describing a database of asylum seekers being used to deny passports to those listed and quoting a Venezuelan official bragging about its existence.

The 2009 Human Rights Report for Venezuela states that unknown assailants physically assaulted and threatened opposition leaders in Venezuela. This report also finds that "violence against lesbian, gay, transgender, and bisexual communities reportedly occurred during the year," and unknown perpetrators killed thirteen transgender individuals in Venezuela between November 2008 and May 2009.

## II. Discussion

Ms. Lopez challenges the timeliness determination and the substantive determinations that she is not entitled to asylum, withholding of removal, or relief under the CAT. She also seeks review of the BIA's denial of her motion to reopen. Given our resolution of the other matters, we need not address the issue of timeliness.

### A. Asylum and Withholding of Removal

Asylum relief is available if a petitioner proves past persecution or a well-founded fear of persecution on account of one of five protected classes: "race,

religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); see Singh v. Gonzales, 495 F.3d 553, 556 (8th Cir. 2007). We have defined persecution as "the infliction or threat of death, torture, or injury to one's person or freedom for a proscribed reason." Zakirov v. Ashcroft, 384 F.3d 541, 546 (8th Cir. 2004) (internal quotation marks omitted). "Persecution is an extreme concept" that "does not include low-level intimidation and harassment." Id. To prevail on an asylum claim, the refugee must show evidence of persecution that is sufficiently specific or imminent. Ladyha v. Holder, 588 F.3d 574, 577 (8th Cir. 2009). A well-founded fear of persecution is presumed, subject to rebuttal, if the petitioner can establish past persecution; otherwise the individual bears the burden of proving the likelihood of future persecution. 8 C.F.R. § 1208.13(b). To meet this latter burden, the petitioner "'must show the fear is both subjectively genuine and objectively reasonable.'" Litvinov v. Holder, 605 F.3d 548, 553 (8th Cir. 2010) (quoting Uli v. Mukasey, 533 F.3d 950, 955 (8th Cir. 2008)). Objectively, a petitioner "must present credible, direct, and specific evidence of facts" to show that a reasonable person in her shoes would fear persecution if returned to her native country. Loulou v. Ashcroft, 354 F.3d 706, 709 (8th Cir. 2003) (internal quotation marks omitted). A petitioner can demonstrate this reasonable fear by proving a pattern or practice of persecuting those similarly situated on account of one of the five protected classes. 8 C.F.R. § 1208.16(b)(2).

Withholding of removal requires an even greater showing; rather than merely a well-founded fear of persecution, a petitioner who cannot make a showing of past persecution must demonstrate that persecution will more likely than not occur if she is returned to her home country. Beck v. Mukasey, 527 F.3d 737, 739 (8th Cir. 2008). As to both asylum and withholding-of-removal claims, we review the BIA's ruling under the deferential substantial-evidence standard, treating administrative findings of fact as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see Eta-Ndu v. Gonzales, 411 F.3d 977, 982 (8th Cir. 2005).

Here, the BIA found no qualifying past persecution and no well-founded fear of future persecution. Ms. Lopez presents several arguments challenging the BIA's findings, arguing that her allegations were sufficiently specific and detailed to show she suffered past persecution and will be targeted for persecution upon return to Venezuela. Concerning past persecution, she argues: (1) she was targeted by snipers at the April 11, 2002 demonstration; (2) she was singled out at vehicle checkpoints; and (3) she was harassed by officers in the park because of her sexual orientation. We do not find her arguments adequately persuasive to overturn the BIA's decision.

First, the record supports the BIA's determination that Ms. Lopez was not specifically targeted by snipers on the basis of a statutorily protected ground. Ms. Lopez was not physically harmed during the April 11 protest, and no evidence exists in the record to suggest that the government knew she was in the crowd of thousands or targeted her. See Diaz v. INS, 56 Fed. Appx. 341, 342 (9th Cir. 2003). Ms. Lopez contends that the Supreme Court's decision in Fedorenko v. United States supports her because it stands for the proposition that being shot at in a group constitutes persecution. 449 U.S. 490, 512 n.34 (1981) (suggesting that a concentration camp guard "shooting at escaping inmates" qualified as persecution). However, Fedorenko did not explore the meaning of the term persecution, and in any event, did not address whether a specific individual in a crowd of thousands of protestors and onlookers faces persecution on a statutorily protected ground because of some indiscriminate firing by government forces. Under the facts of Ms. Lopez's case, we do not believe she can establish past persecution based upon the government's actions on April 11 since the record only shows that Ms. Lopez was caught in the same situation as thousands of members of the public who simply happened to be present in the streets of Caracas at that moment regardless of their political affiliation.

Second, we also find no error in the BIA's factual finding that Ms. Lopez was not singled out at vehicle checkpoints. Although Ms. Lopez alleges she was targeted because police knew her car and knew she supported the opposition, she did not claim

that the officers physically harmed her or refused her passage. Ms. Lopez also concedes that individuals throughout Caracas were likewise stopped and questioned. There is no indication the checkpoint stops she endured were in any way different from the routine stops encountered by Venezuelans with different political beliefs.

Third, the BIA found the police officer's verbal harassment in the park does not rise to the level of persecution that would qualify Ms. Lopez for asylum. See Makatengkeng v. Gonzales, 495 F.3d 876, 884–85 (8th Cir. 2007) (determining that credible fears of being ridiculed and subjected to "mere harassment," even in the aggregate, did not amount to persecution) (internal quotation marks omitted). Ms. Lopez was not physically harmed during this incident, and the police officer's ridicule does not constitute the extreme concept of persecution required for asylum. Accordingly, Ms. Lopez has failed to show that she suffered past persecution.

Regarding future persecution, the BIA found that Ms. Lopez did not meet her burden of proving a reasonable fear of persecution. She argues that if she is returned to Venezuela: (1) she will likely face economic persecution and denial of government services; and (2) she will be singled out for persecution as an opponent of Chavez.

First, we agree with the BIA that the economic and service disadvantages Ms. Lopez fears do not rise to the level of persecution. Ms. Lopez fears she will be forced to sell one of her condominiums at an unfavorable rate, be unable to find as many clients as in the past because of government regulations, and be denied government jobs and services such as renewing her passport. However, Ms. Lopez was able to continue in her position of employment for several months after the April 11 protest, until she chose to leave the country. She was also able to renew her passport in September 2001, while Chavez was in power. Moreover, even if she were to be denied such opportunities and forced to sell her condominium in the future, these problems do not establish statutory persecution. See Feleke v. INS, 118 F.3d 594, 598 (8th Cir. 1997) ("Fears of economic hardship or lack of opportunity do not establish a well-founded fear of persecution.").

Second, the record supports the BIA's finding that Ms. Lopez will likely not be singled out for persecution as a member of the opposition. Ms. Lopez's mother and siblings allegedly support the opposition party, and her mother even held a position with the previous government. However, Ms. Lopez acknowledged that no one else in her family has been targeted by the Chavez regime. Moreover, although there is evidence of Chavez targeting opposition leaders and perhaps collecting a list of those leaders, there is no specific evidence that Ms. Lopez's name would appear on such a list. As mentioned previously, Ms. Lopez does not claim to have been in a position of leadership with the opposition.[3]

## B. Relief Under the CAT

If an applicant is eligible for neither asylum nor withholding of removal, she may still request deferral of removal under the CAT. Deferral of removal is required if Ms. Lopez shows that "it is more likely than not" she would be tortured if returned to Venezuela. Cherichel v. Holder, 591 F.3d 1002, 1007 (8th Cir. 2010).

Here, Ms. Lopez consistently indicated in her applications that she did not fear being tortured in Venezuela. Furthermore, for the same reasons that Ms. Lopez failed to prove the likelihood of persecution for purposes of asylum, her petition for relief under the CAT, which is based on the same arguments, also fails.

---

[3] Additionally, the record shows the BIA had reason even to question the extent of Ms. Lopez's involvement with the Democratic Action Party. Ms. Lopez stated in her 2007 application that she supported the party, yet she originally answered in her 2003 application that neither she nor her family members were part of any Venezuelan groups or organizations. Furthermore, she was able to produce neither her party card nor any evidence of her party involvement other than her testimony.

## C. Motion to Reopen and New Evidence

Federal law generally gives each asylum applicant "the right to file 'one motion to reopen proceeding.'" Dada v. Mukasey, 554 U.S. 1, 15 (2008) (quoting 8 U.S.C. § 1229a(c)(7)(A)). To reopen a claim based on changed circumstances, the petitioner must "state . . . new facts . . . supported by affidavits or other evidentiary material," and the facts must be material to the claim for relief and unavailable and undiscoverable at the time of the former hearing. 8 C.F.R. § 1003.2(c)(1). The BIA will remand only if the new evidence is likely to change the outcome of the case. See Vargas v. Holder, 567 F.3d 387, 391 (8th Cir. 2009). This court reviews the BIA's decision for abuse of discretion. Shaghil v. Holder, 638 F.3d 828, 833 (8th Cir. 2011). The BIA abuses its discretion if its decision is without a rational basis, fails to consider all factors presented, or distorts important aspects of the claim. Vargas, 567 F.3d at 391 (listing these and other grounds for finding an abuse of discretion).

Here, there is no proof that the BIA abused its discretion. Ms. Lopez submitted to the BIA new evidence of worsening conditions in Venezuela since her hearing, alleging: (1) persecution based on sexual orientation has increased; and (2) the government's access to a list of asylum seekers puts her at greater risk.

Ms. Lopez's central claim is now that treatment of homosexuals in Venezuela has worsened. Although her central evidence of this change is the 2009 Human Rights Report stating that thirteen transgender individuals were killed in Venezuela, Ms. Lopez does not claim to be a transgender individual. The BIA was left with a general report of alleged violence based on sexual orientation. While troubling, this information does not demonstrate that Ms. Lopez will be singled out and persecuted.[4]

---

[4] Ms. Lopez also alleges the BIA erred by refusing to consider evidence submitted, as revealed in its statement that country reports from "China" were provided. Yet this seems to be simply a typographical error. The BIA referenced the

-10-

Ms. Lopez also argues that the Chavez government has access to a list of asylum seekers and is using that list to deny passports, as asserted by both the president of ORVEX and the *El Nuevo Herald* article. Although we do not require Ms. Lopez to produce direct evidence of such a list possessed by Chavez, she did not present sufficient evidence for the BIA to find that the Chavez government has persecuted anyone similarly situated as a result of this list. See Litvinov, 605 F.3d at 555 (finding that asylum applicants' general reference to a new law criminalizing opposition to the government in their country of origin did not meet the required objective fear of persecution when applicants could not provide evidence of the referenced law's existence or identify anyone who had been punished under it). Consequently, the BIA was within its discretion in determining that the new evidence of changed circumstances did not warrant reopening Ms. Lopez's case.

### III. Conclusion

Accordingly, we affirm the BIA's denial of Ms. Lopez's applications for asylum, withholding of removal, and deferral of removal, as well as the denial of Ms. Lopez's motion to reopen removal proceedings based on new evidence.

_____

correct report years, and Venezuela is identified accurately in all other instances.